Thomas B. Quinn, Esq.
Jennifer C. Forsyth, Esq.
Mary Byrne Fletcher, Esq.
GORDON & REES LLP
555 17th Street, Suite 3400
Denver, Colorado 80202
Phone: (303) 534-5160
Facsimile: (303) 534-5161
e-mail: tquinn@gordonrees.com
        jforsyth@gordonrees.com
        mfletcher@gordonrees.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| SUSAN FEINMAN, appointed Personal Representative of the Estate of THERESA JO WITT, Deceased.<br><br>Plaintiff,<br><br>vs.<br><br>KINDRED HEALTHCARE, INC., KINDRED NURSING CENTERS WEST, LLC, KINDRED REHAB SERVICES, INC., d/b/a KINDRED NURSING AND REHABILITATION CENTER-SAGE VIEW, and d/b/a SAGE VIEW CARE CENTER; the BOARD OF DIRECTORS, KINDRED NURSING CENTERS WEST, LLC, the BOARD OF DIRECTORS, KINDRED HEALTHCARE SERVICES, INC., the BOARD OF DIRECTORS, KINDRED REHAB SERVICES, INC., the BOARD OF DIRECTORS, KINDRED NURSING AND REHABILITATION CENTER-SAGE VIEW, the BOARD OF DIRECTORS, SAGE VIEW CARE CENTER, and JOHN DOE MANAGEMENT COMPANY,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil No.: 2:11-CV-00289-ABJ |

## DEFENDANTS' MOTION PURSUANT TO FED. R. EVID. 702
## TO EXCLUDE TESTIMONY OF LANCE YOULES
## THAT IS SPECULATIVE OR BEYOND HIS EXPERTISE
## EXHIBIT A

# Report of Lance R. Youles

### Estate of Theresa Jo Witt v. Sage View Care Center, et al.

Lance R. Youles certifies and describes as follows:

1. I was retained by the Rhodes Law Firm, L.L.C. which represents the Plaintiff.

2. For purposes of this report, all references made to "SVCC" shall mean Kindred Healthcare, Inc., Kindred Nursing Centers West, LLC, Kindred Rehab Services, Inc., and Kindred Nursing Centers West, LLC d/b/a Sage View Care Center. This includes SVCC owners, Board(s) of Directors, Management Company(s), Administrator(s), Director(s) of Nursing (DON), facility staff, and consultants.

### RECORDS RECEIVED, ACQUIRED, REVIEWED, AND RELIED UPON

3. I have reviewed records and information from the following facilities, agencies, individuals, and sources concerning Theresa Witt:

   A. Death Certificate;
   B. SVCC: Miscellaneous admission records, miscellaneous medical records, miscellaneous hospital records, and miscellaneous Post Fall Evaluations;
   C. SVCC: Miscellaneous Wyoming Medicaid Cost Reports;
   D. Memorial Hospital of Sweetwater County: Miscellaneous medical records;
   E. Lander Regional Hospital: Miscellaneous medical records;
   F. Riverton Memorial Hospital: Miscellaneous medical records;
   G. Morning Star Care Center: Miscellaneous medical records;
   H. Wind River Healthcare and Rehabilitation: Miscellaneous medical records;
   I. Central Wyoming Neurology: Miscellaneous medical records;
   J. Help for Health Hospice: Miscellaneous medical records;
   K. Gerard Cournoyer, MD: Miscellaneous medical records;
   L. John Iliya, MD: Miscellaneous medical records;
   M. Peter Crane, MD: Miscellaneous medical records;
   N. Adult Protective Services: Miscellaneous records;
   O. Deposition Transcripts and Exhibits: Deborah Johnson-Wood, Melissa Elliott, Kathleen Gaylor, Karen Ratcliff, and Betty Ritter;
   P. Wyoming Department of Health, Office of Healthcare Licensing & Surveys, (WDH): Miscellaneous SVCC surveys including the 11/20/08 survey involving Theresa Witt, facility plans of correction, and correspondence;
   Q. Miscellaneous discovery responses;
   R. Miscellaneous law firm correspondence; and,
   S. First Amended Legal Complaint.

EXHIBIT 6

## MY BACKGROUND, EDUCATION, AND TRAINING

4.      I have practiced, managed, or consulted in nursing facilities, assisted living facilities, and senior housing businesses since 1978.   My background ranges from high school experiences as a Nurse's Aide to post college roles as an Administrator, multi-facility management, turnaround consultant, and facility ownership.   My management experience and knowledge of eldercare laws, regulations, and standards ranges from subacute nursing facilities to home health care.   Most of my career has been devoted to helping nursing facilities in financial and/or regulatory peril throughout the country.  My consulting roles include receivership, temporary management, and monitoring appointments for the State of Michigan.  In addition, I served as an expert witness for the State of Indiana, Office of the Attorney General, to evaluate the competency of Nursing Home Administrators under administrative review for managing nursing facilities that received Substandard Quality of Care violations.

5.      I am a graduate of Ferris State University in Big Rapids, Michigan, with a Bachelor of Science degree in Health Services Management, and an Associate of Science degree in Occupational Safety and Health, both received in 1978.

6.      I have been a Licensed Nursing Home Administrator (LNHA) in good standing since 1978.

## MY NURSING HOME EXPERTISE

7.      I have applied my OSHA education and training throughout my long term care management career.   Consequently, this safety background allows me to opine on resident injuries and deaths arising from unsafe equipment and building conditions.

8.      Based upon my education, training, experience, and research, I am familiar with the standards of care for nursing facilities in Wyoming and the United States.

9.    Based upon my education, training, experience, and research, I am familiar with the standards of practice for <u>Administrators</u> of nursing facilities in Wyoming and the United States.

10.   Based upon my experience as a consultant, corporate executive, and owner of nursing facilities, I am qualified to opine on the duties of a "Governing Body". This includes hiring a competent Administrator, establishing, monitoring, and enforcing internal operating standards, maintaining compliance with State and Federal regulations, providing sufficient facility resources and operating capital, promoting ethical management practices, and to pursue facility profitability without compromising the quality and continuity of resident care.

11.   During my professional career I have experience with nursing home residents who were at risk of **neglect, falls, pressure ulcers, contractures, weight loss, infections, and other negative outcomes** due to their diagnoses and complete dependency on facility governing boards, administration, management, and staff to ensure that they attain or maintain their highest practicable physical, mental, and psychosocial well-being in accordance with State and Federal laws/regulations.

12.   The role and responsibility of Nursing Home Administrators is defined as follows:

> <u>42 C.F.R. § 483.75</u>:
>
> "A facility must be administrated in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial wellbeing of each resident."
>
> <u>Wyoming Administrative Rules: Chapter 11, Section 4 (s)</u>:
>
> "Nursing Home Administrator means a person who operates, manages, supervises, or is in charge of a Nursing Care Facility; and is licensed by the Wyoming Board of Nursing Home Administrators."

3

<u>Wyoming Administrative Rules: Chapter 11, Section 5 (a) (v):</u>

"The Administrator shall enforce the rules and regulations relative to the level of health care and safety of residents and for the protection of their personal and property rights."

13.   The following outline profiles the role/responsibility of Nursing Home Administrators:

- Nursing Home Administrators manage a health care facility that is more regulated than a hospital, and one of the most regulated businesses in the country. No other health care entity is more regulated than a nursing home.

- Nursing Home Administrators are charged with more "individual" responsibility under State and Federal nursing home laws than any other health care professional, including physicians and nurses.

- Nursing Home Administrators are chiefly responsible for maintaining facility standards of resident care, which unlike hospitals and other health care facilities, are written in a "prescriptive" manner by State and Federal (OBRA) regulations. In addition, they must ensure that individuals who practice or work at their facility comply with internal standards, general industry standards in their State, and State licensing/certification standards governing each profession.

- Since regulatory agencies hold Nursing Home Administrators responsible for ensuring that physicians, nurses, dieticians, and other healthcare professions comply with nursing home laws/regulations, they must possess a sufficient level of knowledge to determine whether they are meeting these facility standards. No person who practices or works at their facility can act outside the scope of their administrative authority. This individual responsibility is unique to their profession and cannot be delegated or discharged.

- Nursing Home Administrators are chiefly responsible for preventing, identifying, investigating, correcting, and reporting resident abuse and neglect.

14.   I possess highly specialized knowledge and expertise in the field of Nursing Home Administration, multi-facility management, facility ownership, eldercare laws, regulations, industry standards, and resident rights.   Please see attached CV.

## SCOPE OF MY REVIEW

15.   As is customary for professionals in my field, I have relied on my assessment of Ms. Witt's medical records, SVCC records, WDH records, research, and other relevant information to formulate opinions concerning the standard of care at SVCC during her <u>stay from 1/20/07 to 4/13/09</u>.

4

16.   The opinions expressed in this report are limited to the care of Theresa Witt at SVCC, but may include events which occurred before, during, or after her stay if a pattern of abuse and/or neglect involving other residents becomes apparent, and that conduct is closely related to this case.

17.   The opinions expressed in this report are limited to the operation of Skilled and Intermediate Care Nursing Facilities in Wyoming.  The scope of my review includes regulatory compliance, internal facility standards, facility ownership/governance, corporate control and oversight, facility administration, day-to-day operations, caregiver staffing, operating policies and procedures, caregiver competency, unsafe caregiver acts, unsafe facility conditions, resident rights, and the hiring, training, direction, supervision, and management of individuals who practiced or worked at SVCC during Ms. Witt's stay.

18.   My findings and opinions may reference practitioners, clinicians, and unlicensed staff as employees, agents, or contractors of SVCC, but only to the extent of their conformance with nursing home laws, regulations, internal operating standards, industry practices, and other regulatory, administrative, and institutional standards.

19.   As is customary for professionals in my field, I am guided by the following doctrine when evaluating allegations of resident abuse and neglect:

---

## *"If It Wasn't Documented – It Wasn't Done"*

Creating a paper trail of PROACTIVE INTERVENTION that "speaks for itself" is the prevailing regulatory/industry standard whenever a nursing facility contests allegations of resident abuse and/or neglect. The popular cliché "If it wasn't documented - it wasn't done" is frequently true in situations where dependent residents experience significant lapses in nursing/medical care, such as Theresa Witt at SVCC.  I relied on this doctrine in arriving at some of my opinions in this case.

---

## MY STAFFING EXPERTISE

20.   No factor has a greater impact on the quality of a nursing home resident's care and life than **staffing levels**, whether measured by moments in time i.e., incidents and condition changes, or periods of time i.e., physical and/or cognitive declines. Facility staffing problems range from low one-size-fits-all patterns, to inconsistent deployment, untimely lapses in caregiver coverage, unstable workforce, and unproductive staff.   <u>Unlike many resident care issues, caregiver staffing levels are managed by facility Administrators and Management Companies due to their specialized expertise regarding staffing laws, standards, practices, and economics.</u> Although Physicians, Nurses, and clinicians are the instrument of resident care, their contributions/authority are confined to a nursing home model they did not design and do not manage, especially facility staffing issues.   Planning, managing, and funding caregiver staffing patterns requires executive training and experience. I have devoted a significant portion of my professional career to this complex issue. This includes my roles as a facility Administrator, multi-facility corporate executive, consultant, facility owner, author, and public speaker.

## APPLICABLE STANDARDS

21.   Theresa Witt was entitled to receive nursing home care, treatment, protection, and services in accordance with the following standards:

- Volume 42, Code of Federal Regulations, Part 483, Subpart B;
- Wyoming Health Facilities Act (W.S. § 9-2-1204 et seq.);
- Wyoming Adult Protective Services Act (W.S. § 35-20-112);
- Wyoming Administrative Procedures Act (W.S. § 16-3-101 et seq.);
- Wyoming Administrative Code Chapter 11 et seq;
- Wyoming Administrative Code Chapter 19 et seq;
- Wyoming Administrative Code Chapter 3 et seq;
- General long term care industry standards and practices in Wyoming; and,
- SVCC/Kindred internal standards, i.e., policies, procedures, protocols, etc.

22.    **"FALL PREVENTION ROLES"** in <u>nursing facilities</u> are as follows:

---

# *"Fall Prevention Roles"*

## ADMINISTRATORS
### <u>Planners, Organizers, Directors, and Controllers:</u>

<u>Chiefly responsible for providing the essential components of a "Falls Prevention Program</u>" i.e., internal policies & procedures, competent staff, "individualized staffing levels" for high risk residents, accurate care plans with measurable and effective interventions, physical & occupational Therapy,  restorative nursing care, access to state-of-the-art devices/equipment, documentation standards,  safe building/environment that is free of accident hazards, timely communication between staff, physicians, & family members, effective staff supervision, & effective staff training.  Closely monitor staff compliance with <u>WY</u>, Federal, & Internal standards to ensure the Falls Program is effective & intervene when necessary to ensure continued success.

## PHYSICIANS & CLINICIANS
### <u>Prescribers, Supervisors, Facilitators, and Reporters:</u>

Practice their professions within the framework of <u>WY</u>, Federal, & Internal facility standards including <u>SVCC</u> Falls Program" as organized, directed, & controlled by the Administrator or their designee(s).

## NURSE'S AIDES (CNA'S)
### <u>Facilitators and Reporters:</u>

Practice their profession within the framework of <u>WY</u>, Federal, & Internal facility standards including <u>SVCC</u> Falls Program" as directed by floor nurses, nursing management, and the Administrator or their designee(s).

---

23.    An **"AVOIDABLE ACCIDENT"** in <u>nursing facilities</u> is defined as follows:

---

# *"Avoidable Accident"*

### <u>CMS State Operations Manual (Guidance to Surveyors, F-323, Page 295)</u>

"AVOIDABLE ACCIDENT means that an accident occurred because the facility failed to:

* Identify environmental hazards and individual resident risk of an accident, including the need for supervision; and/or

* Evaluate/analyze the hazards and the risk; and/or

* Implement interventions, including adequate supervision, consistent with a resident's needs, goals, plan of care, and current standards of practice in order to reduce the risk of an accident; and/or

* Monitor the effectiveness of the interventions and modify the interventions as necessary, in accordance with current standards of practice."

---

24.   An **AVOIDABLE PRESSURE ULCER** in nursing facilities is defined as follows:

## *"Avoidable Pressure Ulcer"*

### 42 C.F.R. § 483.25 (c), F-314 – Guidance to Surveyors:

"Avoidable means that the resident developed a pressure ulcer and that the facility did not do one or more of the following: evaluate the resident's clinical condition and pressure ulcer risk factors; define and implement interventions that are consistent with resident needs, resident goals, and recognized standards of practice; monitor and evaluate the impact of the interventions; or revise the interventions as appropriate."

25.   A **STAGE IV PRESSURE ULCER/SORE** is defined as follows:

## *"Stage IV Pressure Ulcer"*

### 42 C.F.R. § 483.25 (c), F-314 – Guidance to Surveyors:

"Full thickness skin loss with extensive destruction, tissue necrosis, or damage to muscle, bone, or supporting structures (e.g., tendon, joint capsule). Undermining and sinus tracts also may be associated with Stage IV pressure sores."

26.   A **SIGNIFICANT WEIGHT LOSS** in nursing facilities is defined as follows:

## *"Significant Weight Loss"*

### 42 C.F.R. § 483.25 (i), F-326

"5% or more in the last (30) days or 10% or more in the last 180 days"

27.   A **FLEXION CONTRACTURE** is defined as follows:

## *"Contracture"*

"An abnormal, usually permanent condition of a joint, characterized by flexion and fixation. It may be caused by atrophy and shortening of muscle fibers resulting from immobilization or by loss of the normal elasticity of connective tissues or the skin, as from the formation of extensive scar tissue over a joint."

Source: Medical Dictionary

8

28.    Resident **"NEGLECT"** in <u>nursing facilities</u> is defined as follows:

---

## *"Resident Neglect"*

<u>42 C.F.R. § 488.301</u>:

"Failure to provide goods and services necessary to avoid physical harm, mental anguish, or mental illness."

---

29.    Federal nursing home staffing standards are based on "<u>sufficiency" regardless of the number of caregivers present</u>, as follows:

---

## *Federal Staffing Standards*

<u>42 C.F.R. § 488.301</u>:

The facility must provide services by sufficient numbers of each of the following types of personnel on a 24-hour basis to provide nursing care to all residents in accordance with resident care plans:

    (i).    Licensed nurses
    (ii).   Other nursing personnel (CNA's)

---

30.    Wyoming nursing home "minimum" staffing standards for <u>hands-on</u> caregivers are based on "<u>sufficiency" and "numbers"</u>, as follows:

---

## *Wyoming Staffing Standards*

<u>Chapter 11, Section 9</u>:

(i)(I)   Each nursing station shall be staffed with a Registered Nurse or qualified Licensed Practical Nurse, who is the charge nurse on the day tour of duty seven (7) days a week.

(i)(ii)  Each nursing station shall be staffed separately and shall have a separate staffing pattern.

(i)(iii)  Each nursing station shall be staffed with sufficient non-licensed nursing personnel to give adequate nursing care to the residents twenty-four (24) hours a day, seven (7) days a week.

(j)(I)   Nursing care hours shall be two and one quarter (2.25) hours for each skilled resident in a Nursing Care Facility in each twenty-four (24) hour period, seven (7) days a week, and one and one half (1.50) hours for each resident who is not skilled in each twenty-four (24) hour period, seven (7) days a week.

---

## BACKGROUND

31. **SVCC is an (82) bed for-profit Skilled Nursing Facility (SNF) in Rock Springs, WY.** It is owned and operated by **Kindred Healthcare, Inc.,** a for-profit company that operates approximately 222 nursing and rehabilitation centers in (27) states.

32. SVCC receives Medicare and Medicaid reimbursement and is therefore required to comply with 42 C.F.R., Part 483, Subpart B, (OBRA Regulations).

33. Deborah Wood was an Administrator during Ms. Witt's stay at SVCC.

34. Betty Ritter was the DON during Ms. Witt's stay at SVCC.

35. SVCC licensed bed capacity, occupancy, home office fees, and related parties were reported as follows according to a Medicaid Cost Report filed for fiscal years ending 6/30/08 and 6/30/09:

---

### *Medicaid Cost Report Filings*

#### Sage View Care Center (SVCC)

Reporting Periods:   (7/1/07 – 6/30/08) and (7/1/08 – 6/30/09)

| | Beds: | Occupancy: | Home Office Fees: | Related Parties ( 5% or more ownership): |
|---|---|---|---|---|
| FY Ending 6/30/08: | 101 | 64.73% | $ 275,935 | - Cornerstone Insurance Corp<br>- PharMerica |
| FY Ending 6/30/09 | 82 | 78.68% | $ 295,131 | - Kindred Healthcare, Inc.<br>- Peoplefirst Rehabilitation |

---

36. **Theresa Jo Witt was a 52-year-old resident who was admitted to SVCC on 1/20/07 for rehabilitation, (24) hour skilled nursing care, supervision, and assistance with her activities of daily living (ADL).   She was considered a FULL CODE during her stay.**

37. Ms. Witt relied on the Medicare Program and Wyoming Medicaid Program to pay for her stay at SVCC.

38. Ms. Witt represented herself at SVCC with assistance from family members.

39. Gerard Cournover, MD was Ms. Witt's attending physician at SVCC.

## FINDINGS

40.    Theresa Witt was <u>completely dependent on SVCC</u> for (24) hour skilled nursing care

and close supervision due to limitations imposed by the following diagnoses:

   **A. Multiple Sclerosis (MS)**
   **B. Depression**
   **C. Seizure Disorder**
   **D. Cerebrovascular Accident**
   **E. Constipation**

41.    Ms. Witt was classified as a **HIGH FALL RISK** during her stay at SVCC.

42.    Ms. Witt was classified as a **PRESSURE ULCER RISK** during her stay at SVCC.

43.    Ms. Witt is described as follows according to a <u>7/10/07</u> "Nursing Assessment/Full"

at SVCC:

   <u>**Contractures:**</u>

   - **Right upper extremity:**      **No**
   - **Left Upper extremity:**       **No**
   - **Right lower extremity:**      **No**
   - **Left lower extremity:**       **No**

44.    Ms. Witt is described as follows according to a <u>10/24/08</u>  "Resident Progress Note"

at SVCC:

   - **"Contractures to lower extremities."**

45.    The following physician's order "first appeared" in Ms. Witt's Treatment Administration

Record (TAR) at SVCC:

   <u>6/1/08 – 6/30/08</u>:

   - **"Keep patient off the wounds as much as possible."**

46.    The following physician's order "first appeared" in Ms. Witt's Treatment Administration

Record (TAR) at SVCC:

   <u>2/1/09 – 2/28/09</u>:

   - **"Turn every 2 hours while in bed and reposition in chair every 2 hours
     while up."**

47.   Ms. Witt's weight was recorded as follows according to "Medical Nutrition Therapy Reviews" at SVCC:

| Admission Weight (1/20/07): 141.4 lbs. | | | | | |
|---|---|---|---|---|---|
| | 9/29/07: | 3/7/08: | 9/26/08: | 12/19/08: | 3/17/09: |
| Current Weight: | 123 lbs. | 124.2lbs. | 115.6 lbs. | 104 lbs. | 100.6 lbs. |
| Weight Loss Post-Admission | - 13% Month 9 | - 12% Month 15 | - 18% Month 21 | - 26% Month 23 | - 28% Month 27 |

48.   Ms. Witt is described as follows according to a 11/15/08 "Physician's Telephone Order" at SVCC:

- **"Discontinue protein supplement until available."**

49.   Ms. Witt is described as follows according to a 1/20/08 "Resident Progress Note" at SVCC:

- **"Consult with resident & Jeff (Medistat) consultant and this nurse regarding use of current STAT 3 low air flow mattress that has been in use for approximately 18 months; also wound vac therapy; chronic non-healing wounds to posterior hip and buttocks; diagnosis: MS (exacerbating progression) attempt to increase movement while in bed; considering initiating use of alternating air pressure mattress i.e., STAT 2 and restart of wound vac PRN."**

50.   Ms. Witt is described as follows according to "Resident Progress Notes" at SVCC:

- **4/11/08: "In great pain with positioning."**
- **6/6/08:   "Has pain with all positioning."**
- **12/4/08: "Complains of severe pain, screaming when moved/repositioned."**

51.   Ms. Witt is described as follows according to a 4/1/03 - 4/3/09 "Restorative ROM/Splinting/Positioning/Program" record " at SVCC:

- **"Patient in too much pain to work with, her pain is not under control."**

52.   Ms. Witt is described as follows according to a 2/1/07 "Minimum Data Set" (MDS), at SVCC:

- Married
- Current Payment Source: Medicare

- Patient responsible for self
- No advanced directives
- **No short or long term memory problems**
- Moderately impaired cognition
- Periods of restlessness
- Highly impaired vision (wears glasses)
- Sad appearance
- Crying/tearfulness
- Sad, anxious appearance
- Verbally abusive
- No change in behavioral symptoms
- Extensive assistance with locomotion on/off unit with (1) person assist
- Total dependence on ADL's with 1-2 persons assist
- Unable to attempt standing balance test
- Functional limitations of upper and lower extremities
- Wheelchair is primary mode of locomotion (wheels self)
- No change in ADL function
- **Continent of bowel**
- Indwelling urinary catheter
- Wear pads/briefs
- **No infections**
- **No problem conditions**
- **No pain symptoms**
- **Fell in past (30) days**
- NOT END STAGE (6 or fewer months to live)
- **No chewing or swallowing problems**
- **5' 3" – 141 lbs.**
- **No recent weight change**
- **No nutritional problems**
- Complains about taste of many foods
- **No history of resolved ulcers**
- **No pressure ulcers**
- **No stasis ulcers**
- **No other skin problems**
- **No foot problems**
- Receiving (7) medications
- Receiving antidepressant
- Special Treatments, Procedures, or Programs: Monitoring acute medical condition
- Receiving physical and occupational therapy
- **Not receiving nursing rehabilitation**
- No devices or restraints in use
- Abnormal laboratory values
- Not enrolled in Hospice
- No intervention programs for mood, behavior, or cognitive loss
- Overall Change in Care Needs: Deterioration
- Discharge status uncertain

53.   Ms. Witt's stay at SVCC was characterized by the following <u>negative outcomes</u>:

# "*Negative Outcomes*"

### <u>THERESA WITT AT SAGE VIEW CARE CENTER (SVCC)</u>
### <u>January 20, 2007 to April 13, 2009</u>

**MEDICAL CONDITIONS:**

* Pressure ulcers up to Stages III and IV
-----------------------------------------------------------------
* Flexion contractures
-----------------------------------------------------------------
* Significant weight loss
-----------------------------------------------------------------
* Infections
-----------------------------------------------------------------
* Daily pain symptoms
-----------------------------------------------------------------
* Swallowing problems/Dysphagia
-----------------------------------------------------------------
* Functional loss
-----------------------------------------------------------------
* Indwelling urinary catheter
-----------------------------------------------------------------
* Incontinent of bowel
-----------------------------------------------------------------
* Decline in cognition
-----------------------------------------------------------------
* Mobility loss
-----------------------------------------------------------------
* Completely dependent on SVCC staff for all aspects of care/supervision

**INCIDENTS/ACCIDENTS:**

* Pattern falls/found on floor including trauma/injury (see finding 54)
* Staff-related incident on 9/9/08 (see finding 54)
* Injuries of unknown origin i.e., skin tears and abrasions

**SOURCES:**   SVCC medical records including a comparison of 2/1/07 MDS to 9/29/08 MDS, deposition testimony, and WDH 11/20/08 survey

**STANDARDS:**   CMS (OBRA), WY Administrative Rules, and nursing home industry standards

54.   Ms. Witt's stay at SVCC was characterized by the following incidents and accidents:

# "Incidents and Accidents"

## THERESA WITT AT SAGE VIEW CARE CENTER (SVCC)
## January 21, 2007 to April 3, 2009

| KEY: | | |
|---|---|---|
| Falls/found on floor from bed: | = FB | |
| Fall/found on floor from wheelchair/chair: | = FC | |
| Staff-related (occurred during direct care): | = SR | |
| Witnessed by staff: | = SW | |
| Recorded via Resident Progress Notes: | = PN | |
| Recorded via Post Fall Evaluations: | = PF | |
| Sustained trauma/injury: | = T/I | |
| Triggered transfer to hospital emergency room: | = ER | |
| Bed/chair alarms introduced post-fall: | = AL | |
| Enablers/positioning devices introduced post-fall: | = E/P | |
| Specialized CNA staffing introduced post-fall: | = SS | |

--------------------------------------------------------------------------------

INCIDENTS/ACCIDENTS:

| | Date: | FB: | FC: | SW: | SR: | PN: | PF: | T/I: | ER: | AL: | E/P: | SS: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 1/21/07: | | X | No | No | Yes | Yes | No | No | No | No | No |
| 2. | 5/15/07: | | X | No | No | Yes | No | Yes | No | No | No | No |
| 3. | 8/26/07: | X | | No | No | Yes | No | No | No | No | No | No |
| 4. | 8/28/07: | X | | No | No | Yes | No | No | No | No | No | No |
| 5. | 10/13/07: | X | | No | No | Yes | No | No | Yes | No | No | No |
| 6. | 3/11/08: | X | | No | No | No | Yes | Yes | No | No | No | No |
| 7. | 5/8/08: | X | | No | No | No | Yes | No | No | No | No | No |
| 8. | 7/2/08: | X | | No | No | Yes | Yes | No | No | No | No | No |
| 9. | 7/31/08: | X | | Yes | No | Yes | Yes | No | No | No | No | No |
| 10. | 9/9/08: | | | Yes | Yes | Yes | No | No | No | No | No | No |
| 11. | 10/1/08: | X | | No | No | Yes | No | No | No | No | No | No |
| 12. | 4/3/09: | | X | No | No | Yes | Yes | No | No | No | No | No |

--------------------------------------------------------------------------------

| ANALYSIS: | TOTAL: | PERCENT: |
|---|---|---|
| Falls/found on floor from bed: | (8) | 66% |
| Falls/found on floor from wheelchair/chair: | (3) | 25% |
| Staff related (occurred during direct care): | (1) | 9% |
| - - - - - - - - - - - - - - - - | | |
| Total number of "documented" incidents/accidents: | (12) | 100% |
| - - - - - - - - - - - - - - - - | | |
| Witnessed by staff: | (2) | 16% |
| Recorded via "Resident Progress Notes": | (10) | 83% |
| Recorded via "Post Fall Evaluations": | (6) | 50% |
| Sustained trauma/injury: | (2) | 16% |
| Triggered transfer to hospital emergency room: | (1) | 8% |
| Bed/chair alarms introduced post-fall: | (0) | 0% |
| Enablers/positioning devices introduced post-fall: | (0) | 0% |
| Specialized CNA staffing introduced post-fall: | (0) | 0% |

55.    Ms. Witt was transferred from SVCC to <u>Help for Health Hospice</u> where she died on

5/31/09.

56.    WDH surveyors completed a survey at SVCC on 11/20/08, which resulted in the

following Federal violations:

- 42 C.F.R. § 483.15(h)(2), F-253 @ Scope/Severity Level E
- 42 C.F.R. § 483.20(k)(3)(i), F-281 @ Scope/Severity Level D
- 42 C.F.R. § 483.20(k)(3)(ii), F-282 @ Scope/Severity Level D
- 42 C.F.R. § 483.25, F-309 @ Scope/Severity Level D
- 42 C.F.R. § 483.25(a)(3), F-312 @ Scope/Severity Level D
- 42 C.F.R. § 483.25 (c), F-314 @ Scope/Severity Level D
- 42 C.F.R. § 483.25(d), F-315 @ Scope/Severity Level D
- 42 C.F.R. § 483.25(e)(2), F-318 @ Scope/Severity Level E
- 42 C.F.R. § 483.25(g)(2), F-322 @ Scope/Severity Level D
- 42 C.F.R. § 483.25 (I), F-329 @ Scope/Severity Level D
- 42 C.F.R. § 483.35(i), F-371 @ Scope/Severity Level F
- 42 C.F.R. § 483.609(c), F-428 @ Scope/Severity Level D
- 42 C.F.R. § 483.75(b), F 492 @ Scope/Severity Level E

**Ms. Witt is identified as "Resident #29" in the WDH survey report (Form CMS – 2567),**

**and is referenced as follows:**

**<u>F-282 (Comprehensive Care Plans)</u>:**

- **"Medical record review for resident #29 revealed a quarterly minimum data set (MDS) assessment dated 9/28/08 which revealed the resident was totally dependent on staff for repositioning and had 3 pressure sores ranging from stage II to stage IV. The resident's care plan last updated on 5/9/08 revealed the resident was to be repositioned every two hours and as needed. Observation on 11/18/08 at 7:15 a.m. revealed the resident in his/her wheelchair in the dining room. Further observation revealed the resident remained in the wheelchair without repositioning until 10:40 a.m. (3 hours and 25 minutes). Interview at that time with nurse assistant (NA) #6 revealed the resident was to be repositioned every two hours."**

**<u>F-309 (Quality of Care – Pain Management)</u>:**

- **"Medical record review for resident #29 revealed a quarterly Minimum Data Set (MDS) assessment dated 9/29/08 which revealed the resident had moderate pain daily. Review of the resident's November 2008 physician recapitulation orders revealed an order dated 9/14/08 for Lortab (a narcotic pain medication) every 3 to 4 hours as needed for breakthrough pain. Observation on 11/18/08 at 9:15 a.m. revealed the resident sitting in a wheelchair in his/her room. Observation at 10:40 a.m. revealed the resident**

had remained in the wheelchair in the room and no staff had entered the room since 9:15 a.m. Observation and interview with the resident at that time revealed the resident was in tears and verbalized being in pain and not being able to reach his/her call light. Further observation revealed the resident's call light was not within the resident's reach. Review of the resident's pain management flowsheet revealed the resident last received the Lortab at 8 p.m. the evening before. Interview on 11/18/08 at 10:40 a.m. with nurse assistant (NA) #6 revealed the resident could use the call light if it was within reach."

### F-314 (Pressure Sores):

- "Medical record review for resident #29 revealed a quarterly minimum data set (MDS) assessment dated 9/28/08 which revealed the resident was totally dependent on staff for repositioning and had 3 pressure sores ranging from stage II to stage IV. The resident's care plan last updated on 5/9/08 revealed the resident was to be repositioned every two hours and as needed. Observation on 11/18/08 at 7:15 a.m. revealed the resident in his/her wheelchair in the dining room. Further observation revealed the resident remained in the wheelchair without repositioning until 10:40 a.m. (3 hours and 25 minutes). Interview at that time with nurse assistant (NA) #6 revealed the resident was to be repositioned every two hours. Observation on 11/18/08 during dressing changes at 1:25 p.m. and 2:50 p.m. revealed 2 stage IV pressure sores, one on the coccyx and one on the left buttock."

### F-318 (Range of Motion):

- "Medical record review for resident #29 revealed a quarterly MDS assessment dated 3/24/08, an annual MDS assessment dated 7/3/08, and a quarterly MDS assessment dated 9/29/08 all of which revealed the resident had limited range of motion in his/her arms, hands, legs, and feet. Further record review revealed an occupational therapy progress noted dated 3/18/08 which stated the resident would be discharged from occupational therapy on 3/27/08 and would be referred to the restorative program. A self-care deficit care plan for the resident last updated on 8/19/08 revealed restorative services. Upon further medical record review, it was revealed there was no documentation of range of motion exercises or restorative services being provided to the resident. Interview on 11/19/08 at 11 a.m. with certified nurse aides (CNA's) #9 and #10 and nurse aide (NA) #6 revealed they did not do any range of motion exercises with the resident."

57. The following excerpts were taken from the 1/28/13 deposition transcript of

Betty Ritter:

- A: "We had sheets that they would use to write all the weights down, and then go back and document."

- Q: "Uh-huh."
- A: "So I can't"
- Q: "You don't see those sheets."
- A: "No." [77]

---

- Q: "In looking at your surveys and looking at some other things, you had a little trouble with - - with continuity of staff, didn't you?"
- A: "Yes." [162]

---

- Q: "Then I would assume that you would have notes of your care planning conferences, or whatever, that would talk about how to increase or to get the same successes with – with – with ingestion of foods for Ms. Witt, as perhaps as Ms. Jones has having, so she wouldn't experience a 30-pound weight loss."
- A: "I don't have notes, no." [175]

---

- Q: "Okay.  Unfortunately, in - - in October of 07' and November 07', we don't find any records, correct?"
- A: "None that are here, no." [180]

---

- Q: "Were there times during the time that Mrs. Witt was there that you considered yourself to be understaffed?"
- A: "There were times when I consider we were not at optimal staffing, no. Yes, we were not." [185]

---

- Q: "When Mrs. Witt came in, as you recall, what - - what were her - - what was the level of her contractures that she had?"
- A: "I don't believe there's any listed." [185]

---

- Q: "Did you have a care plan, any care plan that reflected that there was made a determination that these decubitus were unavoidable?  Therefore, uncurable?"
- A: "Not that I believe we have reported here." [212]

58.  The following excerpts were taken from the 1/29/13 deposition transcript of

Karen Ratcliff:

- Q: "Okay.  So when a pressure ulcer is triggered, on the RAP, those other triggers are also – are also created correct?"
- A: "That's what it appears."
- Q: "Will you find for me a care plan for pressure ulcers."
- A: "Skin interior impaired actually related to pressure wounds to lateral buttocks, second stage, unreadable, left scapula, left medial, bilateral hips, right ankle."
- Q: "And if you'll give me the date and the page number."
- A: "8/28/2008.  What page number do you want?"
- Q: "The one that's listed down there, the Bates says, Sage View something."
- A: "001529."

- Q: "Okay.  And that's August of 08?"
- A: "Yes, ma'am."
- Q: "Was there any other care plan prior to August of '08 for pressure ulcers?"
- A: "Let me look."
- Q: "Okay."
- A: "No, ma'am, there is not another care plan for pressure ulcers before that date."  [54-55]

---

- Q: "Does it show me when the dressings were changed?"
- A: "Only once."
- Q: "Does it tell me when the canister was changed?"
- A: "No."
- Q: "Does it tell me when the hydrocolloid dressings were applied with the Triad cream?"
- A: "No."
- Q: "To the lift hip?"
- A: "No."
- Q: "No? Okay.  If the treatment was done and not charted, do you consider the charting adequate?"
- A: "No."  [86]

---

- Q: "In your opinion, does the charting you reviewed today accurately reflect the wound care that Theresa Witt received when she was a resident at Sage View?"
- A: "No."  [100]

59.  The following excerpts were taken from the 1/29/13 deposition transcript of

Melissa Elliott:

- Q: "Okay.  Did you ever have days where you were the only aide on the Frontier Hall?"
- A: "Yes."  [23]

---

- Q: "Did you find those forms?  The turn forms in that record?"
- A: "I didn't think so.  I don't – I don't know."
- Q: "You don't recall seeing those."
- A: "I don't recall.  Yeah."  [48]

---

- Q: "Is there a document, do you know, that records when skin checks are done?"
- A: "Nothing that I ever filled out."  [60]

---

- Q: "So as a CNA, you were never told, we need to record this resident's fluid intake?"
- A: "No.  Not that I can remember."  [61]

19

60.     The following excerpts were taken from the 1/29/13 deposition transcript of

Kathleen Gaylor:

- Q: "Is it written anywhere that you've told the CNA's to - - to make sure they turn and reposition?"
- A: "No."  [36]

---

- Q: "Where is it documented in the record that somebody is repositioned?
- A: "It's not documented."  [37]

---

- A: "By the time a resident has reached a stage 2, we are on very frequent turning schedule, a very frequent monitoring schedule."
- Q: "Where would that would be documented in the record?"
- A: "It wouldn't be."
- Q: "Why?"
- A: "Apparently, we didn't have the forms."  [75]

---

- Q: "Where is that documented that they've done range of motion?"
- A: "I don't see it documented anywhere."
- Q: "In the record?"
- A: "I don't see it documented anywhere, range of motion."  [94]

61.     The following excerpts were taken from the 1/30/13 deposition transcript of

Deborah Johnson-Wood:

- Q:  "Now, as the executive director of the facility, simplest I guess, part, is that the buck stops with you, right?"
- A: "yes."  [19]

---

- A: "There have been times since I have been there that we have had a hard time finding enough staff."  [26]

---

- Q: "If your facility didn't purchase any protein supplements, use that as an example, okay."
- A: "Uh-huh."
- Q: "Would that affect your bottom line?"
- A: "Not significantly, no."
- Q: "Okay.  But it would improve your profit margin by whatever the number is."
- A: "Could.  Yes."

---

- Q: "In your experience, does that represent what you would consider to be adequate charting for someone that was supposed to have been tracked as to their intake?"
- A: "No."  [47]

## APPLICABLE STANDARDS OF CARE AND
## SAGE VIEW CARE CENTER'S BREACH OF THE STANDARDS OF CARE

62.   **BREACH #1:    FAILURE TO PREVENT NEGLECT**
      **STANDARDS:    PLEASE SEE OPINION 70-A**

A.   Theresa Witt was a victim of **NEGLECT** during her stay at SVCC based on the failures identified in this report and standards in paragraphs (21) to (30).

B.   Ms. Witt experienced several negative outcomes during her stay at SVCC. Please see finding (53). Many of these outcomes were "avoidable" according to standards identified in paragraphs (21) to (30).

C.   SVCC management and staff approached Ms. Witt's MS as though her susceptibility to pressure ulcers, flexion contractures, significant weight loss, infections, and pain was an "unavoidable" consequence of this disease. They appeared to exercise less caregiver vigilance because aggressive intervention, in their view, would not prevent or delay these negative outcomes.   However, she was NOT classified as "end-stage", "terminal", or enrolled in "hospice" during her stay according to her medical records at SVCC, including her last MDS on 3/16/09.  It is important to recognize that the MDS is not only designed to accurately capture clinical data for care planning purposes, but **it also serves as a monthly billing mechanism (invoice) for residents receiving Medicare and Medicaid coverage**. Aside from contributing to negative resident outcomes, inaccurate MDS information is a serious infraction and may constitute "billing fraud".

D.   Ms. Witt relied on the **Medicare Program** to pay for a portion of her stay. Unfortunately, she did not receive this "Skilled" level of care (LOC) and services as evidenced by the negative outcomes in finding (53).

E.   SVCC staff testimony in this case is characterized by attempts to separate extremely negligent documentation from Ms. Witt's negative outcomes. When questioned about their deficient acts/practices, nursing staff either deflects accountability for her outcomes by promoting her comorbidities; claims her outcomes were unavoidable without producing a paper trail; labels her as noncompliant to draw attention away from their deviations; promotes staff communication as more important than documentation; avoids policies, protocols, and practices that define the standard of care; reduces quality resident care to a choice between rendering or writing; implies that staff are less accountable if they acted with good intentions; or, suggests that the only individuals who are worthy of critiquing Ms. Witt's care and treatment are SVCC caregivers **as they are able to recall**. <u>This "deflective" testimony was very apparent when SVCC management and Floor Nurses were confronted with details of her negligent care and treatment.</u>

F.   SVCC failed to address Ms. Witt's severe pain symptoms as evidenced by the violation it received from WDH on 11/20/08.  Please see finding (56).

G.   Ms. Witt's negative outcomes at SVCC represent a **negligent retention**. In particular, facility officials had a choice during her first year at the facility. Either provide the necessary care and supervision to protect her from avoidable harm or recommend an alternant nursing home placement. The failure to take any course of action was not a responsible option, and such disregard implied that the facility was willing and/or able to fully meet her needs, which it was not.

22

H.     In my opinion, the highest duty of care is owed to nursing home residents who completely rely on their caregivers as did Ms. Witt at SVCC.

**63.   BREACH #2:     FAILURE TO PREVENT PRESSURE ULCERS**
**       STANDARDS:     PLEASE SEE OPINION 70-B**

A. Ms. Witt was admitted to SVCC on 1/20/07 with no pressure ulcers.  Please see finding (52).

B. Ms. Witt was considered a **HIGH PRESSURE ULCER RISK** during her stay at SVCC.

C. Ms. Witt developed several pressure ulcers/sores during her stay at SVCC up to and including Stage IV.  Please see paragraph (25) for the definition of a **STAGE IV PRESSURE ULCER**.

D. Most of the pressure ulcers Ms. Witt developed at SVCC were **AVOIDABLE** according to the standard identified in paragraph (24).

E. Ms. Witt was considered a **HIGH NUTRITIONAL RISK** at SVCC and experienced a significant weight loss, which is a well-recognized catalyst for pressure ulcer development.

F. Ms. Witt developed several **FLEXION CONTRACTURES** during her stay at SVCC, which are a well-recognized catalyst for pressure ulcer development.

G. There is no documented evidence that Ms. Witt was turned and repositioned every (2) hours or less on a shift-to-shift basis 24/7 throughout her stay at SVCC. The standard of repositioning residents every (2) hours or less is only "symbolic" without a routine form of validation (paper trail).  Verbally instructing CNA's is not a credible alternative to a structured repositioning program.

H. <u>SVCC received Federal violations F-282 and F-314 on 11/20/08 for failing to turn and reposition Ms. Witt in a timely manner.</u>   If SVCC staff could not meet this standard when WDH surveyors were roaming the building, it is fair to assume that this failure was the rule and not the exception.

I. SVCC turning and repositioning records are characterized by the following problems:

- There was no physician's order in the **TAR** to: "Keep patient off the wounds as much as possible" <u>until June 2008</u>, and there are many shifts/days during the balance of Ms. Witt's stay when this duty was not documented by SVCC Nurses
- There was no physician's order in the **TAR** to: "Turn every 2 hours while in bed and reposition in chair every 2 hours while up" until February 2009, and there are many shift/days during the balance of Ms. Witt's stay when this duty was not documented by SVCC Nurses
- **Resident Progress Notes** contain very few entries that reference turning and repositioning
- **CNA flow-sheets** are virtually nonexistent regarding this practice
- **Restorative nursing care** was too sporadic to constitute routine turning and repositioning

J. As a Nursing Home Administrator, I recognize that resident comorbidities can cause and/or significantly contribute to negative resident outcomes such as pressure ulcer development, despite the steadfast efforts of nursing staff. However, I also recognize that this defense lacks credibility in the absence of a preexisting paper trail **generated during their stay** that characterized these negative outcomes as clinically "unavoidable" <u>and removes any doubt whether they were caused by neglect.</u>   Promoting this defense after-the-fact without such evidence was an instrumental factor in launching the regulatory reforms of "OBRA – 87".   Another defensive facility strategy for deflecting accountability is **classifying wounds as unavoidable after facility staff allows them to reach a point of no recovery** as they did with Ms. Witt.

K. There is no documented evidence that CNA's knew that Ms. Witt required vigilant turning and repositioning <u>at least every (2) hours</u> and could not treat this responsibility with the same discretionary judgment as residents that did not have skin breakdown.  In other words, this particular duty was not subject to the mindset; "if I have time".

64.  **BREACH #3:    FAILURE TO PREVENT CONTRACTURES**
     **STANDARDS:    PLEASE SEE OPINION 70-C**

A. Ms. Witt was admitted to SVCC on 1/20/07 with no flexion contractures. Please see finding (43).

B. Ms. Witt developed several contractures during her stay at SVCC as defined in paragraph (27).  Please also see finding (44).

C. SVCC received this Federal violation (F-318) from WDH in response to the 11/20/08 survey regarding Ms. Witt.   Please see finding (56).

D. There is no documented evidence that Ms. Witt received range-of-motion (ROM) every (2) hours when awake on a shift-to-shift basis 24/7 during her stay. This failure is similar to the repositioning problems previously identified.

E. SVCC failed to provide "restorative nursing care" throughout Ms. Witt's stay, despite her MS, functional limitations, and high risk of flexion contractures. The following excerpt was taken from the 11/20/08 WDH survey report, and  describes the SVCC restorative program in 2008:

- **"During an interview on 11/20/08 at 8:50 a.m. the director of nursing (DON) and district director of clinical operations (DDCO) both stated the facility realized there were problems with the restorative program, therefore in October all residents were discharged from the program. They stated the facility did not develop a plan to assure range of motion services were provided to residents while the restorative program was being re-developed.  The DON states she thought some range of motion was done by certified nurse aides (CNA's) during activities of daily living (ADL's), but there would be no documentation to support that.  [14-15]**

65.   **BREACH #4:    FAILURE TO PREVENT ACCIDENTS/FALLS**
      **STANDARDS:    PLEASE SEE OPINION 70-D**

A. Ms. Witt experienced a pattern of falls/accidents during her stay at SVCC.

Please see finding (54).

B. Ms. Witt's pattern of falls/accidents at SVCC was characterized by the

following failures:

- Failure to properly supervise her
- Failure to properly transfer her
- Failure to generate "Resident Progress Notes"
- Failure to generate "Post Fall Evaluations"
- Failure to use bed/chair alarms
- Failure to use enablers/positioning devices
- Failure to provide specialized staffing
- Failure to exercise greater vigilance from one accident to the next

Please see finding (54).

C. Most of Ms. Witt's falls/accidents at SVCC constitute **AVOIDABLE ACCIDENTS**

<u>according to the standard identified in paragraph (23)</u>.

D. Ms. Witt lacked safety awareness and could not be relied upon to ask SVCC

caregivers for assistance.

E. Ms. Witt could not reach and/or activate her call-light which required SVCC to

place her on a more intense CNA monitoring schedule than every (2) hours.

However, this level of attention was not provided.

F. It appears that SVCC officials subscribe to the policy that residents must fall,

fall frequently, and sustain serious trauma and injuries before it is required to

undertake assertive interventions.  In other words, residents must experience

"actual harm" to validate this risk and justify greater caregiver supervision.

This lack of resolve by SVCC staff was very apparent during my review and

exposed Ms. Witt to unnecessary accident hazards and harm.

G. Ms. Witt's falls/accidents subjected her pressure ulcers to unnecessary trauma and harm.

H. Ms. Witt's "Falls Care Plan" is written in a cursory and nondescript manner and does not commit SVCC caregivers to meaningful interventions.

I. SVCC apparently utilizes the "Falling Star Program" which is a facility-wide approach to promote fall safety awareness. Although this <u>passive program</u> frequently appears on many survey plans of correction, it seldom has traction on a day-to-day basis. Many bedside caregivers, especially CNA's, only treat at-large facility initiatives like the Falling Star Program as their responsibility when and if they have time. Consequently, these discretionary duties cannot be relied upon.

66. **BREACH #6:    FAILURE TO PREVENT WEIGHT LOSS**
    **STANDARDS:    PLEASE SEE OPINION 70-F**

A. Ms. Witt was considered a **HIGH NUTRITIONAL RISK** at SVCC.

B. Ms. Witt experienced a **SIGNIFICANT WEIGHT LOSS** at SVCC as defined in paragraph (26) and illustrated in finding (47). In particular, she experienced a loss of (41) lbs. (28% of her body weight)) from 1/20/07 to 3/17/09.

C. Ms. Witt's significant weight loss at SVCC was **AVOIDABLE** according to CMS - OBRA standards.

D. Ms. Witt was not engaged in a "Restorative Feeding Program" at SVCC, and there is no documented evidence that she received <u>individualized</u> feeding attention in response to the weight loss identified in finding (47).

E. CNA food/fluid consumption flow-sheets at SVCC are very generic and do not offer an accurate account of Ms. Witt's intake.

**67.  BREACH # 5:   FAILURE TO PROVIDE SUFFICIENT STAFF
      STANDARDS:   PLEASE SEE OPINION 70-E**

A. SVCC corporate officials and facility management failed to assign a sufficient number of qualified nursing staff to <u>Theresa Witt</u> based on the failures identified in this report.

B. There are numerous "indicators" of caregiver staffing problems at SVCC during Ms. Witt's stay including the following examples:

1.  **Negative outcomes identified in finding (53)**
2.  **Incidents/accidents and analysis identified in finding (54)**
3.  **Failure to intensify bedside supervision and/or introduce assistive devices during the pattern identified in finding (54)**
4.  **Failure to comply with physician orders**
5.  **Cursory care plan, and failure to identify and address medical problems in a timely fashion**
6.  **Failure to comply with care plan interventions**
7.  **Failure to provide turning and repositioning**
8.  **Failure to utilize written accountability tools to ensure turning and repositioning for high risk residents, especially those like Ms. Witt who have Stage III and IV pressure ulcers**
9.  **Failure to record intake and provide eating assistance**
10. **Failure to provide ROM and restorative nursing care**
11. **Failure to provide timely incontinence care**
12. **11/20/08 WDH survey violations identified in finding (56)**
13. **Use of (12) hour nursing shifts, which is a reliable indicator of short-staffing conditions and high employee turnover rates**
14. **Failure to maintain medical records in accordance with accepted professional and industry standards**
15. **Failure to provide a LOC equal to or greater than Medicare**
16. **Staffing admissions made during SVCC staff depositions**

C. Chronic caregiver understaffing appears to be the "root cause" of many negative outcomes identified in finding (53) based on my review and analysis of the records and testimony provided to me. <u>By understaffing I am referring to the lack of "individualized" bedside care Ms. Witt received in relation to her **very high level of acuity.**</u>  She required a specialized CNA assignment where duties like repositioning, incontinence care, ROM, and feeding assistance

were <u>based on her individual needs</u> and not driven by "assembly-line-care" where she only received bedside attention every (2+) hours <u>at best</u> like every other resident at SVCC.   Caregiver understaffing is described as follows:

---

# *"Caregiver Understaffing"*

**Results when the numbers of direct care staff scheduled in a nursing facility, i.e., Floor Nurses and CNA's, were originally below average nursing home staffing levels in the State and US, but above State "minimum" statutory standards.  However, even when the facility is able to replace all "call offs" for the shift in question, these marginal staffing conditions substantially increase the likelihood of resident abuse and/or neglect. <u>This type of staffing problem is usually frequent, shift-to-shift, and is foreseeable due to marginal caregiver staffing patterns that are driven by high facility profit expectations</u>.**

---

D. I reserve the right to modify my opinions when SVCC staffing records during Ms. Witt's stay are provided in this case, especially caregiver staffing records produced as: <u>hours worked per-patient-per-day (HPPD)</u>.

68.  **BREACH #7:      FAILURE TO PROVIDE EFFECTIVE ADMINISTRATION AND A RESPONSIBLE GOVERNING BODY**
     **STANDARDS:     PLEASE SEE OPINION 70-G**

A. For purposes of this report, all references made to "Governing Body" shall mean Kindred Healthcare, Inc., Kindred Nursing Centers West, LLC, Kindred Rehab Services, Inc., and Kindred Nursing Centers West.

B. The negative outcomes Ms. Witt experienced at SVCC were destined to occur based on operating policies and practices that placed the financial interests of SVCC and Kindred Healthcare above her care, treatment, and wellbeing. This "rationing" of care and services was very apparent during my review. Examples includes chronic understaffing, eliminating her protein supplement, replacing her low air loss bed with an alternating pressure mattress, and the failure to use a portable x-ray company.

29

C. Ms. Witt's quality of care and life was managed by (3) different Administrators during her stay at SVCC.  <u>Excessive executive turnover</u> usually results from an ineffective and/or absentee Governing Body, and is a reliable index of a troubled nursing facility.

D. No individuals had more influence over the quality of Ms. Witt's care and life at SVCC than the Administrator(s) and the Governing Body.  **They conceived, sponsored, and controlled the operational model that defined the <u>boundaries of her care and treatment</u>.**  The integrity of this "model" should be measured by their resolve to hire and retain dedicated caregivers, properly train them, schedule a sufficient number of them, inspire them to always strive for the highest possible quality of resident care attainable, closely supervise them, provide a safe environment, adequate resources, proven internal standards, and consistent-dynamic leadership.  This mission begins in the boardroom and ends at the bedside and no caregiver at SVCC could overcome the challenges of a dysfunctional model that forced them to leave the supervision and care of Ms. Witt to chance.  <u>The failures identified in this report are a testament to a failed operational model and misguided mission in my opinion.</u>

E. The failures identified in this report reflect absentee facility administration and corporate management.

F. Kindred Healthcare did not earn the home office fees identified in paragraph (35) based on the failures identified in this report.

G. Administrators who worked at SVCC during Ms. Witt's stay fell below the standard of practice for a Licensed Nursing Home Administrator (LNHA) in Wyoming in my professional opinion.

H. SVCC and Kindred Healthcare misrepresented the quality and scope of their services based on the failures identified in this report.

I. There is no evidence that SVCC staff received the proper training and supervision in light of the failures identified in this report.

J. Quality Assurance activities at SVCC from 2007-2009 appear to be nonexistent based on the failures identified in this report.

K. As a Nursing Home Administrator, who is responsible for administering a facility in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident under State and Federal laws/regulations, I found evidence that Theresa Witt was a victim of neglect during her stay at SVCC based on standards identified in paragraphs (21) – (30).

69. **BREACH #8:      FAILURE TO MAINTAIN MEDICAL RECORDS**
**STANDARDS:    PLEASE SEE OPINION 70-H**

A. Ms. Witt's medical records at SVCC provide a very poor account of her day-to-day status.  For example, despite her high acuity, there are many untimely gaps in Resident Progress Notes, many charting omissions in her TAR, and numerous other charting problems.

B. Several medical records were conspicuously missing during my review. This means that they were never generated, are missing, were destroyed, or are being withheld, which is extremely troubling.

C. SVCC nurses did not reference Ms. Witts's care plan in their nurse's notes, which suggests that they were not familiar with or guided by these important plans.

D. Ms. Witt was not an appropriate candidate for the doctrine of charting by exception or episodic charting, which is merely a **budgetary policy** to ration documentation in order to lower the number of Floor Nurses to operate a shift. Her diagnosis, complete dependency on staff, pressure ulcer development, flexion contractures, nutrition, and other negative outcomes demanded a higher level of documentation than she received.

## OPINION

70. **Based on my education, training, management expertise, regulatory knowledge, and knowledge of Skilled Nursing Facilities, it is my belief to a reasonable degree of professional certainty that the owners, Board(s) of Directors, Management Company, Administrator, DON, facility staff, and consultants at SVCC failed to provide the necessary care and services for Theresa Witt to attain or maintain her highest practicable physical, mental, and psychosocial wellbeing, which constitutes NEGLECT. The repeated failure of SVCC to provide the necessary care and services to Ms. Witt and to prevent the failures identified in this report, caused and/or significantly contributed to many of the negative outcomes in finding (52). Accordingly, SVCC fell below the standard of care for a Skilled Nursing Facility operating in Wyoming based on <u>facility and administrative standards</u> identified in paragraphs (21) – (30) in general and the following failures in particular:**

A. **FAILURE TO PREVENT RESIDENT NEGLECT;**

| *Applicable Standards:* | *Breach of Applicable Standards:* |
|---|---|
| • Federal Statutes/Administrative Rules: | 42 C.F.R. § 483.13 (b) & (c), F-224<br>42 C.F.R. § 488.301 |
| • Industry/Community (WY & US): | Apply, and there is a breach |

## B.  FAILURE TO PREVENT THE DEVELOPMENT OF PRESSURE ULCERS;

| *Applicable Standards:* | *Breach of Applicable Standards:* |
|---|---|
| • Federal Statutes/Administrative Rules:<br>• Industry/Community (WY & US): | 42 C.F.R. § 483.25 (c), F-314<br>Apply, and there is a breach |

## C.  FAILURE TO PREVENT THE DEVELOPMENT OF CONTRACTURES;

| *Applicable Standards:* | *Breach of Applicable Standards:* |
|---|---|
| • Federal Statutes/Administrative Rules:<br>•Wyoming Statutes/Administrative rules:<br>• Industry/Community (WY & US): | 42 C.F.R. § 483.25 (e)(2), F-318<br>Chapter 11, Section 9 (c) (I)(II)<br>Apply, and there is a breach |

## D.  FAILURE TO PROVIDE A SAFE ENVIRONMENT AND ADEQUATE SUPERVISION AND ASSISTIVE DEVICES TO PREVENT ACCIDENTS;

| *Applicable Standards:* | *Breach of Applicable Standards:* |
|---|---|
| • Federal Statutes/Administrative Rules:<br>• Industry/Community (WY & US): | 42 C.F.R. § 483.25 (H), F-323<br>Apply, and there is a breach |

## E.  FAILURE TO MAINTAIN ACCEPTABLE PARAMETERS OF NUTRITION;

| *Applicable Standards:* | *Breach of Applicable Standards:* |
|---|---|
| • Federal Statutes/Administrative Rules:<br>• Wyoming Statutes/Administrative Rules:<br>• Industry/Community (WY & US): | 42 C.F.R. § 483.25 (I)(1), F-325 & F-326<br>Chapter 11, Section 9 (d)(II)(iv)<br>Apply, and there is a breach |

## F.  FAILURE TO PROVIDE A SUFFICIENT NUMBER OF QUALIFIED STAFF;

| *Applicable Standards:* | *Breach of Applicable Standards:* |
|---|---|
| • Federal Statutes/Administrative Rules:<br>• Wyoming Statutes/Administrative Rules:<br>• Industry/Community (WY & US): | 42 C.F.R. § 483.30 (a), F-353<br>Chapter 11, Section 9 (I)(I)-(I)(I)<br>Apply, and there is a breach |

### G. FAILURE TO PROVIDE EFFECTIVE FACILITY ADMINISTRATION AND A RESPONSIBLE GOVERNING BODY; AND,

| *Applicable Standards:* | *Breach of Applicable Standards:* |
|---|---|
| • Federal Statutes/Administrative Rules: | 42 C.F.R. § 483.75, F-490 |
| | 42 C.F.R. § 483.75 (d), F-493 |
| • Wyoming Statutes/Administrative Rules: | Chapter 11, Section 4 (s) |
| | Chapter 11, Section 5 (a)(v)(vi) |
| | Chapter 11, Section 4 (j) |
| | Chapter 11, Section 5 (a)(l) |
| • Industry/Community (WY & US): | Apply, and there is a breach |

### H. FAILURE TO MAINTAIN MEDICAL RECORDS IN ACCORDANCE WITH ACCEPTED PROFESSIONAL AND INDUSTRY STANDARDS.

| *Applicable Standards:* | *Breach of Applicable Standards:* |
|---|---|
| • Federal Statutes/Administrative Rules: | 42 C.F.R. § 483.75 (1) (1), F-514 |
| • Wyoming Statutes/Administrative Rules: | Chapter 11, Section 16 |
| • Industry/Community (WY & US): | Apply, and there is a breach |

## CONDUCT OF THE DEFENDANTS

71.   Based on my review and analysis of the records and testimony provided to me, it is my opinion that the failures identified in this report constitute **reckless conduct** by the Defendants.

## CLOSING COMMENTS

72.   I have not prepared any exhibits at the present time.   However, I reserve the right to refer to any documents reviewed as exhibits if I amend my report or provide testimony in this matter.

73.   The findings and opinions expressed in paragraphs (53) and (70) are not mutually dependent on an overarching expert theory, finding, opinion, etc.

74.   I offer my opinions with confidence.   However, I reserve the right to amend my report if significant additional information becomes available through discovery.

75.    Some of my opinions address subject matter that is common to other nursing home experts.   However, my opinions offer a perspective that is unique to my expertise and is not duplicative.  In addition, most of my opinions can only be expressed by a professional with my education, training, and experience.

76.    All findings and opinions contained within this report are based on the records provided to me, research, my education, training, and extensive experience with matters involving resident abuse and neglect.

77.    My findings and opinions are based on a thorough analysis of this case which may not be contained or attached to this report.   Therefore, I reserve the right to disclose these additional "details" during my deposition and/or trial testimony.

Respectfully submitted:

_____
Lance R. Youles, BS, LNHA

*March 13, 2013*
**Date**