Thomas B. Quinn, Esq.
Jennifer C. Forsyth, Esq.
Mary Byrne Fletcher, Esq.
GORDON & REES LLP
555 17th Street, Suite 3400
Denver, Colorado 80202
Phone: (303) 534-5160
Facsimile: (303) 534-5161
e-mail: tquinn@gordonrees.com
         jforsyth@gordonrees.com
         mfletcher@gordonrees.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| SUSAN FEINMAN, appointed Personal Representative of the Estate of THERESA JO WITT, Deceased. ) ) ) Plaintiff, ) ) vs. ) ) KINDRED HEALTHCARE, INC., KINDRED NURSING CENTERS WEST, LLC, KINDRED REHAB SERVICES, INC., d/b/a KINDRED NURSING AND REHABILITATION CENTER-SAGE VIEW, and d/b/a SAGE VIEW CARE CENTER; the BOARD OF DIRECTORS, KINDRED NURSING CENTERS WEST, LLC, the BOARD OF DIRECTORS, KINDRED HEALTHCARE SERVICES, INC., the BOARD OF DIRECTORS, KINDRED REHAB SERVICES, INC., the BOARD OF DIRECTORS, KINDRED NURSING AND REHABILITATION CENTER-SAGE VIEW, the BOARD OF DIRECTORS, SAGE VIEW CARE CENTER, and JOHN DOE MANAGEMENT COMPANY, ) ) ) ) ) ) ) ) ) ) ) ) Defendants. ) ) | Civil No.: 2:11-CV-00289-ABJ |

**DEFENDANTS' MOTION PURSUANT TO FED. R. EVID. 702**
**TO EXCLUDE TESTIMONY OF LANCE YOULES**
**THAT IS SPECULATIVE OR BEYOND HIS EXPERTISE**
**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

SUSAN FEINMAN, appointed
Personal Representative of the
Estate of THERESA JO WITT,
Deceased,

        Plaintiff,

vs.                Civil No: 2:11-CV-00289-ABJ

KINDRED HEALTHCARE, INC., KINDRED
NURSING CENTERS WEST, LLC, KINDRED
REHAB SERVICES, INC., d/b/a KINDRED
NURSING AND REHABILITATION CENTER-SAGE
VIEW, and d/b/a SAGE VIEW CARE CENTER;
The BOARD OF DIRECTORS, KINDRED NURSING
CENTERS WEST, LLC, THE BOARD OF DIRECTORS,
KINDRED HEALTHCARE SERVICES, INC., THE BOARD
OF DIRECTORS, KINDRED REHAB SERVICES, INC.,
THE BOARD OF DIRECTORS, KINDRED NURSING AND
REHABILITATION CENTER-SAGE VIEW, THE BOARD
OF DIRECTORS, SAGE VIEW CARE CENTER, and
JOHN DOE MANAGEMENT COMPANY,

        Defendants.

Lance Youles
6/7/2013

### Page 6

1. numbers to complete that. And some people are confused
2. as to what hours per patient day spreadsheet is which is
3. a report that is produced from payroll. And so as not
4. to confuse anyone -- and I have seen these before with
5. Kindred -- their form looks very similar to this. And
6. that's the form I requested that I typically get from
7. most companies.
8. Q. Okay. So that's Number 1. And then --
9.     DEPOSITION EXHIBIT 2
10.     WAS MARKED BY THE REPORTER
11.     FOR IDENTIFICATION
12. A. Number 2 would be my original report with some
13. handwritten notes as a form of preparation for today.
14. Q. Okay.
15.     DEPOSITION EXHIBIT 3
16.     WAS MARKED BY THE REPORTER
17.     FOR IDENTIFICATION
18. A. Number 3 would be my supplemental report. You probably
19. want to put this next.
20. Q. Thank you.
21.     DEPOSITION EXHIBITS 4 AND 5
22.     WERE MARKED BY THE REPORTER
23.     FOR IDENTIFICATION
24. A. Which I produced a few months later. The last is the
25. report of Miss Olson, defense expert, with some

### Page 7

1. handwritten notes and my notebook. My customary
2. practice is to have a notebook with billing statements,
3. not complete though. I have one more yet to generate.
4. Correspondence from the law firm. Correspondence, I
5. think there's a death certificate, notes and so forth.
6. Q. Very good. We are done. I forgot to do 6. I had 6 in
7. my lap. What is 6?
8.     DEPOSITION EXHIBIT 6
9.     WAS MARKED BY THE REPORTER
10.     FOR IDENTIFICATION
11. A. 6 is a file that I maintain for any states that I have
12. that identifies the statutes, administrative rules and
13. standards of practice in Wyoming not only for
14. administrators and facilities, but I also have the
15. standards of practice for nurses as well. There are
16. some highlights and tabs within these particular
17. records.
18.     MR. QUINN: Very good. Thank you.
19.     THE VIDEOGRAPHER: We are on the record. This
20. is the videotaped deposition of Lance Youles, being
21. taken in Romulus, Michigan. Today is June the 6th,
22. 2013. And the time is 10:10 and 58 seconds a.m. Would
23. the attorneys please introduce themselves and who they
24. represent, and the court reporter please swear in the
25. witness?

### Page 8

1.     MR. HARANG: I'm Jack Harang, and I'm here on
2. behalf of the plaintiff.
3.     MR. QUINN: I'm Tom Quinn, and I'm here on
4. behalf of the defendants.
5.     LANCE YOULES,
6. having first been duly sworn, was examined and testified
7. on his oath as follows:
8. EXAMINATION BY MR. QUINN:
9. Q. Please state your name.
10. A. Lance, middle name R-a-n-d, last name Y-o-u-l-e-s.
11. Q. Okay. I'm going to -- I see we left the door open. I'm
12. going to close that real quickly. Mr. Youles, I want to
13. go over your background to start with. First of all,
14. you're not a licensed physician, is that correct?
15. A. Yes, that's correct.
16. Q. Not a licensed nurse?
17. A. That's correct.
18. Q. Not a licensed certified nursing assistant?
19. A. That's correct.
20. Q. Not a registered dietician?
21. A. No.
22. Q. Not a therapist?
23. A. No.
24. Q. Not a social worker?
25. A. That's correct.

### Page 9

1. Q. You have no training as a physician, is that right?
2. A. That's correct.
3. Q. No training as a nurse?
4. A. Not formally, no.
5. Q. By that we mean there's no -- you haven't been to -- you
6. haven't been to school to be a nurse, is that correct?
7. A. No. And the programs I've been in, I have had a lot of
8. the same classes they have but, no, I have not been in
9. any nursing program, no.
10. Q. So, that would mean you haven't been to a college or a
11. junior college or an online nursing accredited course,
12. correct?
13. A. Well, I have had courses on pressure sores and all kinds
14. of other things but only to maintain my license, not as
15. a nurse, no.
16. Q. Same thing with registered dietician, you haven't been
17. one of those, is that correct?
18. A. No.
19. Q. And you haven't been a certified nursing assistant?
20. A. No.
21. Q. Excuse me, let me rephrase that. You haven't been
22. through the certified nursing assistant classes,
23. correct?
24. A. No. I did have those classes, and I maintained an
25. agency where I trained everybody else. I just didn't

Lance Youles
6/7/2013

Page 10

1  certify myself, that's all.
2  Q. When you say you had an agency where you trained
3     everyone else, what do you mean by that?
4  A. In the late -- let's see, around 1999 to about 2001,
5     there was a nursing facility in northern Michigan that
6     was so remote that it couldn't train its own aides. It
7     had some problems, and the state revoked its
8     certification. So, I created an agency since I was
9     involved as a consultant with that facility that --
10    where a nurse and I would certify nurses' aides. We had
11    to go through a process with the state of Michigan to
12    become certified and have a course and so forth. And so
13    I managed that program. I had the nurse actually do the
14    training, but it was my certification program. I did
15    that for about two, three years.
16 Q. We'll come back to that in a moment. You're not a --
17    you have no training as a physical therapist,
18    occupational therapist or speech therapist, correct?
19 A. That's correct.
20 Q. And you have no training as a social worker, correct?
21 A. That's correct.
22 Q. And you have no training as a restorative therapist?
23 A. That's correct.
24 Q. So, you said you were in a remote part of Michigan and
25    it was difficult to -- what -- why did you create the

Page 11

1     agency?
2  A. This nursing home was in Sheboygan, Michigan, which is
3     just south of Mackinaw. And there's just no one up
4     there. And when you lose your certification to train
5     internally due to surveys, you have to rely on outside
6     sources to train the aides for you. There just wasn't
7     anyone up there. And so, I created an agency to keep
8     this facility going where they would find the staff.
9     This nurse and I through our program would certify them,
10    and that would allow this facility to continually staff
11    itself.
12 Q. And what role did you have with the facility at that
13    time?
14 A. I was just a sort of quasi-consultant. I wasn't in
15    charge of it in terms of the operations. But the
16    company that asked me to do that had me as a consultant
17    in this state for all of its facilities, and that
18    happened to be one that they had some trouble with.
19 Q. The name of that building was?
20 A. Sheboygan Health Care Center.
21 Q. And the name of the company that used you as a
22    consultant was?
23 A. That was ServiceMaster Diversified Health Services.
24 Q. And the timing of that was?
25 A. I want to say it was like 1999 to about 2001 or '02,

Page 12

1     somewhere in there.
2  Q. So, you -- so, the facility as I understand it was
3     having a difficult time because of its remoteness in
4     maintaining adequate numbers of CNA's, is that right?
5  A. Right. And it lost its privilege to train internally
6     which you do if you have bad surveys for two years. So
7     it had to rely on some outside source to do that for
8     them.
9  Q. You did CNA's only?
10 A. Yes.
11 Q. Who did the nurses?
12 A. Well, the nurses are already licensed. So, it's not a
13    problem. I mean, you just hire them if you can.
14 Q. Did the facility -- did that facility use agency
15    staffing before you created the -- before you created
16    the training facility or training opportunity?
17 A. No, because there were no agencies up there.
18 Q. The only license that you have held with respect to sort
19    of long-term care industry would be nursing home
20    administrator, is that right?
21 A. That's correct.
22 Q. In the state of Michigan?
23 A. For a while in Arizona for about three, four or five
24    years.
25 Q. Now, you and I have met before.

Page 13

1  A. Yes, sir.
2  Q. A couple times?
3  A. Yes, sir.
4  Q. So, if I -- can I rely on your testimony regarding your
5     background and experience in some of the other
6     depositions so we don't have to go through it today?
7  A. Absolutely, sir.
8  Q. Nothing has changed about that?
9  A. No.
10 Q. Okay. So, in terms of being a nursing home
11    administrator, you're not required to have a physician's
12    license or a nursing license or a CNA license, is that a
13    fair statement?
14 A. No. They all report to me, but my license is to manage
15    the facility. And then my license is also a personal
16    form of conduct or practice standards for nursing home
17    administrators.
18 Q. While you can't -- while serving as an administrator at
19    a nursing home -- and to quote you from a moment ago,
20    the physicians, the nurses, and the CNA's report to
21    you -- it's fair to say that you cannot substitute your
22    opinions for that of a physician in terms of care and
23    treatment to a resident, correct?
24 A. Well, it becomes kind of a gray area. I mean, when you
25    talk about regulations or so forth, if a doctor violates

Lance Youles
6/7/2013

Page 22

1  that I looked at. I looked at the cost reports, both
2  Medicare and Medicaid. There is a concept under CMS, a
3  filing concept called related party where if you as an
4  individual or entity derive more than five percent of
5  your income from a nursing home, you have to disclose
6  who they are. I actually listed that in my report. I
7  have some prior experience with another case in this
8  facility. So, I have some recall in that regard. This
9  is my first time I've had a Kindred case. So, I think
10 it's just looking at the filings, cost reports, the
11 testimony like Miss Rocke and others. So, it's just
12 based on pretty much those issues.
13 Q. Okay. On page 1, paragraph 2 of your initial report,
14 you state for the purposes of this report, all
15 references made to, quote "SVCC," end quote, shall mean
16 Kindred Healthcare Inc., Kindred Nursing Centers West,
17 Kindred Rehab Services, Inc., and Kindred Nursing
18 Centers, LLC, d/b/a Sage View Care Center. This
19 includes SVCC owners, board of directors, management
20 companies, administrators, directors of nursing,
21 facilities staff and consultants.
22 A. Yes, sir.
23 Q. Are you saying -- when you say that, are you saying that
24 there is no separation of corporate status or do you
25 just do this for ease of reference?

Page 23

1  A. I'm not a lawyer. So, I don't get into the separations
2  necessarily of corporations. As a nursing home operator
3  or someone who operated facilities on a corporate level,
4  there's just two issues I look at with a nursing home;
5  where does the money go to, and where's the control
6  derived from? And there's no doubt that when you look
7  at money, at least my experience with this company, when
8  you look at the flow of income from the facility onward
9  or the control from a corporate standpoint or oversight
10 standpoint, it all flows right to Kindred.
11       They may have different entities, maybe
12 Kindred West, or they may have an operational entity or
13 a financial entity. But if not for their facilities,
14 they would not exist. So, from my perspective,
15 practical perspective as an operator, I'd seen no
16 separation when I follow who controls that administrator
17 and where that income goes once it's swept from the
18 accounts from that administrator. And that's -- if I
19 find through discovery something else, then I'll take
20 some of those parties out. But I've not seen that.
21 Q. So, when you say, when you see money swept from
22 accounts --
23 A. Well, what I mean by that, I'm not talking about
24 necessarily in this case. The facility obviously
25 deposits money, and that money is going to go on to the

Page 24

1  parent company. Now, in these cost reports for example,
2  Kindred is listed as the related party. There are
3  management fees that are derived. So I know just from
4  these cost reports that Kindred is deriving a management
5  fee from operating these facilities. Well, obviously
6  that management fee is being assessed against this
7  particular one. While I may not be able to connect
8  every single dot between the facility and the parent
9  company, I know that -- there's no doubt in my mind that
10 they both control this facility, and they derive income
11 from it. And so, from the standpoint of how Miss Witt
12 was cared for, there's no doubt that that begins with
13 the parent company in Louisville.
14 Q. So, when you say you read the cost report and money goes
15 to Kindred, can you show me that?
16 A. Yeah. What I meant by that is, for example, in my
17 supplemental report --
18 Q. No, on the cost report.
19 A. Yes, my -- well, in my supplemental report I identify a
20 cost report filing with Medicare. And it shows home
21 office fees that are derived. Now, if I go to my
22 original report which is a Medicaid report -- and that
23 is on page 10 in the Wyoming Medicaid report -- it says
24 related parties. And I just have up there five percent
25 or more of ownership. And they are identifying all of

Page 25

1  the companies that have five percent or more. When you
2  look at -- I think Cornerstone might be an insurance
3  company. When you look at Kindred Healthcare, Inc.,
4  from my perspective and experience, that is the entity
5  that operates this facility. I don't think the
6  insurance company does. The pharmacy company I'm sure
7  doesn't. People First Rehab certainly doesn't. That is
8  the only operational company listed as a related party.
9  So from a practical matter, there's no one else to
10 manage this but Kindred.
11 Q. What operational role does Kindred Healthcare, Inc.,
12 play with respect to Sage View Care Center?
13 A. Well, in my opinion, Kindred Health --
14 Q. Not in your opinion, but the facts. I need a fact
15 statement, not in your opinion.
16 A. Well, the facts of the matter are, that whether it's
17 through Louisville or their regional office, they
18 provide oversight of management of this facility
19 including people like Miss Rocke, who will travel this
20 facility, whether they're a regional vice president,
21 whether they're a nurse consultant, whether they're a
22 dietetic consultant, whoever provides support services,
23 those services are arranged for or derived from Kindred
24 in my opinion.
25 Q. Who does Miss Rocke work for?



Page 42

1  A. Yeah. I think philosophically I agree with you. But
2     the problem is in the course of all those things, you
3     run into regulations. So, if you -- if a doctor says,
4     okay, I'm going to write an order for turning and
5     repositioning, it may or may not be working. But if the
6     staff is not documenting it, for example, from my
7     perspective they have failed in that regard. So, there
8     is different dynamics to it. Where clinical issues are
9     defined by regulations, it becomes a whole different
10    thing. But in terms of the practice of medicine or
11    nursing, I don't get involved in the practice of
12    medicine or nursing.
13 Q. As a nursing home administrator, you cannot prescribe
14    medical treatments?
15 A. No. Only a physician can, a nurse can't either. A
16    nurse can't even talk about causation actually. But the
17    questions that you're asking me are very clearly defined
18    in the standard of practice with Wyoming. And
19    unfortunately there are a lot of -- it's a lot of
20    language in here that says that I'm responsible for
21    standards of quality care. I have to evaluate the
22    quality of resident care. I mean, there's language in
23    here that holds me personally responsible for issues
24    where resident care is mentioned many times; evaluating
25    it, ensuring it and so forth.

Page 43

1     So, while these other individuals may be the
2     instrument of care, if they don't do their job, it's
3     going to come to me. So, ultimately I'm responsible for
4     the care that resident gets, whether I get into the
5     details of it or not. And that's the problem is that
6     it's not an open ended thing where doctors and nurses do
7     their thing and it works or doesn't work, oh well. No.
8     I'm ultimately held accountable. And the language in
9     Wyoming under the practice of administration clearly
10    says I am responsible for resident care. So, it's a
11    partnership that we have, the clinicians and myself.
12    But they do not operate independently of me.
13 Q. As a nursing home administrator, you cannot express an
14    opinion on medical cause of illnesses or conditions that
15    develop as a consequence of MS, correct?
16 A. No. I can just say as a layperson, these would be the
17    issues that we would want to pay attention to for care
18    planning or other kinds of things.
19 Q. With respect to Theresa Witt, you cannot express
20    opinions of what her medical condition was at any given
21    point in time, correct?
22 A. I can state what the records state. I know that there's
23    periods of time where she had five stage 3's. The
24    records are what the records are. So -- and I would be
25    responsible to do that. If the surveyor came in and

Page 44

1     said, where was Theresa as of November, 2008, I could
2     tell them by what these records state. Now, in terms of
3     medical judgment or diagnoses, that would be a
4     physician. But these records clearly catalog what her
5     condition was throughout her stay.
6  Q. I'm not asking about what the record states. Let me say
7     it again. As a nursing home administrator, with respect
8     to Theresa Witt, you cannot express opinions on what her
9     medical condition was at any given point in time?
10 A. I can't express any medical opinions, no, sir.
11 Q. Therefore you cannot express an opinion on what Theresa
12    Witt's highest practicable, physical, mental and
13    psychosocial well being was at any given point in time?
14 A. Well, that's a problem because under F 490,
15    administration, administrators, that language I am
16    directly held to personally. And I can tell you that
17    the way that that language is carried out for me is
18    different than a doctor or nurse. It's -- or could be
19    for a nurse. And what it's saying is that in essence --
20    that language appears a lot in the CFR -- that the
21    standards have to be met.
22    If these regulations or standards are not met,
23    then that is the threshold by which the government
24    believes a breach has occurred. So, it's a different
25    standard for me than it would be -- doctors don't have

Page 45

1     that kind of a standard.
2  Q. What I'm saying is, is your job as a nursing home
3     administrator, if I understand your testimony, is that
4     you have to provide the resources so that Theresa Witt
5     can maintain or achieve the highest practicable,
6     physical, mental and psychosocial well being during her
7     residency at a skilled nursing facility such as Sage
8     View, correct?
9  A. That is part of it. But again, if you look at the
10    standards of practice, it says that I will evaluate the
11    quality of resident care, I will ensure that the
12    facility complies and make sure that the standards of
13    quality resident care are met. I have to ensure it, I
14    have to ensure it's good and delivered, I have to make
15    sure the facility standards are developed and carried
16    out. It also says nursing home administrators, and I
17    quote, "Nursing home administrator's responsibility to
18    provide quality resident care." I'm providing it.
19    So, while I may not be rendering it directly
20    as a nurse or a doctor, these regulations and standards
21    say my influence as an architect if you will versus a
22    builder, my influence has as much to do with the
23    delivery of this care as the caregivers themselves.
24 Q. I mean, you have to make sure that those resources are
25    in place to achieve those goals, correct?

Lance Youles
6/7/2013

Page 46

1  A. I also have to -- yeah, I have to evaluate them and make
2  sure that they are adequate and proper and so forth,
3  yes, sir.
4  Q. Okay. But in terms of where she is at a given point in
5  time -- let me rephrase it. Where Theresa Witt is in
6  terms of achieving the highest practicable, physical and
7  psychosocial well being, is for the physician to
8  determine, correct?
9  A. I really disagree because there are in my report, based
10  on the standards I have and the lack of documentation
11  and so forth, it was not met many times. Their
12  standards that they're looking at with regards to your
13  question are medical standards. My standards, no, they
14  weren't. If you have a pressure sore like she did in
15  February, 2009, five stage 3's, and there's one nurse's
16  note the whole month, that's a breach of making sure
17  that she's closely monitored and documented. That's a
18  breach.
19       That's something different than a doctor will
20  look at. Doctors are not going to evaluate that breach
21  by virtue of the regulations that I have. So, I think
22  we're just in two different realms. I don't do any
23  medical causation. I'm not a doctor or a nurse, but I
24  can evaluate whether this facility at any given point in
25  time was meeting these standards, my standards. I can

Page 47

1  do that.
2  Q. I appreciate that, that you're saying -- I guess what
3  I'm hearing you say is during multiple points in time,
4  Sage View did not provide the resources, either from an
5  administrative perspective or a nursing perspective, to
6  allow Theresa Witt to achieve the highest practicable,
7  physical, mental and psychosocial well being, is that
8  correct?
9  A. I wouldn't say nursing. I would say from a regulatory
10  perspective which does impact nursing, no, they did not
11  provide those resources. There's not evidence that they
12  did.
13  Q. But from a different perspective, a physician -- you
14  could not express a diagnostic opinion whether indeed
15  Mrs. Witt was actually achieving the highest
16  practicable, physical, mental and psychosocial well being
17  that she could under her current diagnosis and
18  condition?
19  A. Well, it's an odd question because I've never seen a
20  doctor in my whole career ever write that, state that,
21  repeat that. It's not even their standard. I've never
22  even -- there's no doctors' standards that -- that's a
23  regulatory standard that you're quoting. It's not a
24  medical standard. I'm sorry, it's just not. It's not a
25  medical standard.

Page 48

1  Q. I'm not asking you whether it's a medical standard or
2  not. I'm just asking what -- you can't do what the
3  doctor can do, correct?
4  A. We've agreed to that. I can't. But, you know, their
5  interpretation or feelings does not trump what the staff
6  is responsible to do. Just because they think something
7  is not avoidable or whatever doesn't mean a regulation
8  wasn't violated and we didn't care for her properly.
9  So, they don't have overarching opinions that dismiss
10  the standards that I opine on.
11  Q. When you say that you have -- on page 4, paragraph 15 of
12  your report -- I'm sorry I didn't direct to you that --
13  that you have made a, quote, "assessment of the
14  records," end quote, what do you mean by that?
15  A. I'm not sure I follow you. What paragraph is that, sir?
16  Q. Page 4, paragraph 15, I have relied on my quote,
17  "assessment," end quote of Mrs. Witt's medical records.
18  What do you mean by that?
19  A. Well, it's -- I could have used the term evaluation
20  analysis. I don't use the word assessment from the
21  context of a nurse. I'm just used to that term in these
22  circles. It would be my analysis or evaluation based on
23  my expertise.
24  Q. As a -- when you say WDH records, what are those?
25  A. The Wyoming Department of Health.

Page 49

1  Q. And when you say medical records, what are those?
2  A. Well, the medical records would be any of the medical
3  records that were supplied to me that might be to the
4  facility proper, it might be her hospital records. I
5  don't go too far beyond right before she came in and
6  then after she left. But it would be any of the medical
7  records that are supplied to me. But my opinions are
8  really confined to the nursing home, not the hospital or
9  anywhere else.
10  Q. That was the purpose of my question. How far do you go
11  beyond those?
12  A. I generally only look at the hospital stay if she had
13  one before she came in, anything during that, including
14  clinics, and then the hospital stay after she left. I
15  call it my bookends. Now, some doctor might look two
16  years down the road. I don't do that. I couldn't as an
17  administration, not relevant to me.
18  Q. Let's go to the research. What other research did you
19  do in this case? Do you see right behind WDH Records?
20  A. Right. I think I -- I don't have a website, but I might
21  have looked at Medicare.gov on this facility. I think I
22  did some research which I think I provided to you on
23  staffing, what the average staffing numbers were in the
24  state of Wyoming that year. I still have to do some
25  adjustments on this before I can opine on some things.

# Lance Youles
## 6/7/2013

### Page 50

1 So, staffing I would look at, surveys I would
2 look at. Sometimes I'll look at the company, what
3 representations it's making. That's all I can think of.
4 I try to list as much as I can, and I think I have
5 listed Medicare.gov. Maybe I haven't, but I usually do.
6 It's not in here but --
7 Q. I was going to ask you about that.
8 A. I think I did do -- I have to look and see, but I'm
9 pretty sure I have that. I might have it from another
10 case. I definitely have a library of staffing records
11 that I look at to compare them to their peers. I do
12 some independent research with regard to standards in
13 the state. I sometimes talk to surveyors, not
14 particularly about a facility but just to gain some
15 information. But I think that's all I can think of.
16 Q. Are any of your -- do any of your opinions include any
17 information which you gained upon Medicare.gov?
18 A. I can't recall offhand, and I don't think it did only
19 because this is a rather older case compared to some
20 with regard to being 2013. And she left I think in '09
21 it was. And so, Medicare.gov only goes back a couple
22 of years. So, I don't know what its five star rating
23 was back then. And I don't recall that from any other
24 experiences. I sometimes look at that, sometimes don't.
25 So, I don't really think that -- if I was relying on it,

### Page 51

1 it would be in my report.
2 Q. In any other relevant information is the next phrase in
3 here. In terms of the relevant information that you
4 might have brought, is it the material that you
5 collectively brought here today for our review?
6 A. I do my very best to list it in any of my reports and
7 even like something that's independent like that I do.
8 I really do my best to list it in my reports or put it
9 in my notes. I would say I've captured almost
10 everything.
11 Q. I note that in terms of the long-term care survey, it
12 looks like you brought the 2007 edition, is that right?
13 A. Right.
14 Q. That's what you used in this case?
15 A. Yeah, that would go until about 2009. The 2007 edition,
16 F 324, became just at 323. And I think in this case I
17 just went with F 323 because that really was the only
18 big change in those two years. I have the other one,
19 the newer one. But that really is the one that those
20 surveys would have been done on.
21 Q. Okay. You know, one time -- and maybe you still do, but
22 you were using sort of a four by six card format. Are
23 you still using that for your case analysis?
24 A. No, I don't do that anymore. In a case like this where
25 I have reports that I do, I wouldn't doing something

### Page 52

1 like that. I have a different format I use when I don't
2 do a report because I don't like speaking from notes.
3 But no.
4 Q. Do you remember what I'm talking about, the four by six
5 cards?
6 A. I don't do that anymore.
7 Q. How are you doing?
8 A. I'm doing okay.
9 Q. I want to talk to you briefly about charting, and some
10 of this we have covered in the past. But would you
11 agree as a nursing home administrator, you don't
12 actually write charting notes?
13 A. I have at times in the social services section where I
14 have some issues with families, but generally not. In
15 all -- any of the meetings, I would -- quality assurance
16 or in the risk meeting to talk about falls, whatever, I
17 have. But I don't chart in the chart typically, no.
18 Q. I want to go to the bottom of page 5, paragraph 19. If
19 it wasn't documented, it wasn't done. You refer to that
20 as an old cliche, correct?
21 A. Yes, except to the extent at how I qualify it here. You
22 can't document everything in a nursing home. What I'm
23 saying is if there are significant issues that -- for
24 example, pressure sores and weights, if there's
25 significant issues and there's doubt about it, then that

### Page 53

1 is the doctrine that comes into play.
2 It's interesting, almost every nurse that you
3 corner will tell you that they learn that in nursing
4 school, they heard that. I hear it from surveyors all
5 the time. But it only applies to a circumstance where
6 there's some doubt about whether something was done. If
7 someone didn't document someone eating and that person
8 has no weight loss or nutrition problems, I would say
9 it's not relevant. So, it really is more of an outcome
10 based. So, it's not just a theory that applies to
11 everything. I would never even suggest that.
12 Q. You note in here in your last sentence, I relied on this
13 doctrine in arriving at some of my opinions in this
14 case. Which opinions are related to the cliche, if it
15 wasn't documented, it wasn't done?
16 A. There's quite a few. For example, when you look at her
17 from November, '08, until April, '09, she really
18 declines considerably. And I say this all as an
19 administrator. And I don't know how many pressure sores
20 she had in February, but I think there's just one
21 nurse's note.
22 My goodness, even their own charting standards
23 would require them to identify what her daily status is.
24 PAR's and MAR's are not enough. But I look at the fact
25 that when they did decide to document turning and

Lance Youles
6/7/2013

### Page 74

1  to -- we were talking about staffing right at the end of
2  the break, and we had talked about the difference
3  between skilled and non-skilled staffing levels under
4  Wyoming regulations, do you recall?
5       MR. HARANG: Objection.
6       THE WITNESS: The only thing that I can tell
7  you is that I can only make an assumption that they
8  might mean skilled as in Medicare. I haven't actually
9  researched that, but there are some states that hold a
10 certain level of care to be skilled as well. So, I'm
11 assuming it might be, but I'd have to research to make
12 sure. Some states have an actual definition of that
13 outside Medicare. I just haven't checked on that. No
14 one has actually asked me.
15 BY MR. QUINN:
16 Q. Moving to your supplement, you give an expanded or you
17 address staffing in a more expanded manner in page 3.
18 A. I do. I got to tell you that on the graph under
19 paragraph B, if I were to testify in court today, I
20 would say to a reasonable degree of professional
21 certainty that this facility operates at best at a
22 borderline above 2.25 and certainly believe low 3.0.
23 Without getting this data, I made some assumptions on
24 this raw data to get me to what I think were two days
25 where they were under. But as -- in my capacity as

### Page 75

1  professional unless I get this kind of data, I can't
2  opine that they went below. I have a reason to believe
3  they probably did go below.
4       MR. HARANG: This kind of data, you're talking
5  about Exhibit --
6       THE WITNESS: Yes, which I have requested in
7  this report.
8       MR. HARANG: As in exhibit --
9       THE WITNESS: Right. This company produces
10 it, they testified they produced it. There's no doubt
11 they have it, and they have to maintain it anyway
12 because it's made from payroll. And payroll records
13 have to be maintained for seven years. Once I have
14 that, I might retract some of this. I might change some
15 of this. I have no doubt that they budget and operate
16 quite a bit below the state average. But I'm holding my
17 opinions on whether they went below 2.25 until I can
18 confirm it with their own data, which again, I have seen
19 this. I know they produce it. They said in a
20 deposition they produce it. And that's what I'm holding
21 out for before I am conclusive about violating the 2.25.
22 BY MR. QUINN:
23 Q. When you say they said in a deposition they produce it,
24 are you talking a deposition in this case?
25 A. Yes. Miss Rocke indicated that they maintain this type

### Page 76

1  of record, HPPD spreadsheets. This is common. I've
2  actually seen Kindred's before. It's very similar to
3  this. This is my creation. But any company out there,
4  they are very similar to this. In fact, you can't even
5  manage these buildings without having this. And this is
6  what they typically generate from payroll because they
7  do -- they still have it because you have to maintain
8  payroll records. And an administrator would get this
9  every two weeks when they run payroll to see if he's met
10 these numbers or she. Once I get that, that's their
11 data. I'll have to take out the DON -- a DON -- I'll be
12 able to know definitively where they stood at the time
13 during Miss Witts' stay.
14 Q. So, you kept talking about this document. You were
15 talking about Youles Number 1?
16 A. Yes. It's an HPPD spreadsheet this company maintains in
17 order to comply with its budget and maintain -- or to
18 manage it on a day-to-day basis. Again, this is driven
19 from payroll. So, they would still have it. In almost
20 any cases I have, I can get it from any of these
21 companies. I've seen it with this company. They say
22 they do it too. I just haven't gotten it yet. But I
23 did request it in my particular supplemental report.
24 So, with regard to staffing, that's where I stand on
25 those numbers at this point.

### Page 77

1  Q. All right. I know I'm bouncing around documents right
2  now. I'm sorry about that. With Youles Exhibit 1, you
3  have a date column on the far left side. For example,
4  January 1, it looks like 2013. Is that -- am I reading
5  that accurately and --
6  A. This is just a sample, but yes, sir.
7  Q. Is it a sample with -- is it a sample based upon data
8  that was actually developed from this building, meaning
9  Sage View, on this date?
10 A. This is a fictitious building that I created so that I
11 can show -- the problem I have to be honest with you, I
12 request this and then people give me all this nonsense,
13 we don't do this, they don't do that. So, I created
14 this because anybody in the industry once they see this,
15 well, yeah, we do this. So, I created this so when I
16 ask specifically on any of my cases where I'm on the
17 plaintiff's side for this record, no one can dispute
18 this is what I want, this is what we produce. And so, I
19 did it for the purposes of making real clear what I
20 want.
21 Q. Thank you for that explanation.
22 A. Sure.
23 Q. Moving back to page 3 of your supplemental report,
24 you've got -- I want to talk about the sourcing for
25 certain columns so that you've got under Wyoming average

Lance Youles
6/7/2013

Page 78

1  3.7. What is the source for that information?
2  A. I got that -- those sources are from Medicare, CMS. You
3     can get those from Medicare.gov. I've got a database
4     that will tell me every state in the last ten years what
5     their average has been, what the U.S. average that year
6     was. I think in the preceding state it actually went to
7     -- or the next year it went down to 3.5. So that's CMS
8     data that's published all over the Internet. That's
9     what an average facility would have.
10        I do intend if the case goes too far to
11    actually compare this to its competitors to see where
12    they stand. And that's one more column I might have of
13    what other facilities in this area did. But that's the
14    average facility, and that comes from the government.
15 Q. So, is the sourcing data for the Wyoming average column
16    on page 3 of your supplemental report, is it in the red
17    well or is it within the documents and materials that
18    you have produced here today?
19 A. No. I forgot to bring that. I think I did produce it
20    upon request. When I submitted this report, I think I
21    had a request from you of where that data was, and I did
22    submit that.
23 Q. Okay.
24 A. I didn't bring it with me today, I'm sorry. But I do
25    recall that when someone asked me where that came

Page 79

1  from -- I can get it when I get back and send it to you
2  again if you want.
3  Q. That's fine. I don't recall it, but we will get to the
4     bottom of it. We now have some time to get to the
5     bottom of it. So, with that said, do you know the
6     methodology of -- that was used to determine the Wyoming
7     average? In other words, what were -- who were the care
8     providers that were included within the formula to
9     determine the daily HPPD?
10 A. That's the same data that you would get nowadays on
11    Medicare.gov. If you look at the manner in which they
12    derive that, there are certain periods of the year
13    usually during surveys but possibly on a quarterly basis
14    where the Wyoming Department of Health will ask for a
15    two-week staffing, always with surveys, sometimes
16    quarterly. They will use that data from either routine
17    surveys, complaint surveys or quarterly summary surveys.
18    They're two-week cycles. They use that data as a basis
19    of determining what those averages are.
20 Q. Are you talking about the Med 13 reporting?
21 A. Med 13.
22 Q. So, Med 13 is the two-week window snapshot, is that what
23    you're talking about?
24 A. Well, they -- if you have a complaint survey they're
25    going to ask for two weeks. If you have a standard

Page 80

1  survey they're going ask for two weeks. I have to check
2  with Wyoming. There are some states that ask for it
3  every quarter no matter what. But whatever their
4  database is, this is based on a sample that is requested
5  from the state agency that's filled out by the facility
6  on a form designated by the state agency. And that data
7  then is sent to CMS, and CMS will then compare that data
8  to other facilities in that state to determine the
9  average. That's where it comes from.
10 Q. So, if I were to log on right now, would I be able to go
11    to a website that shows me the various Wyoming averages
12    on the select 2000 date 7's that -- 2007 dates that you
13    have listed here?
14 A. Well, I don't know if you're a member of the American
15    Health Care Association, but I get a lot of my data from
16    them. They go back quite a few years and show averages.
17    I might have got some of it from them. But again,
18    they're going to get it from CMS. The source of all of
19    this is CMS. Because this is several years back, it may
20    not be as current and easy to get as if you maybe go to
21    some sources like the American Health Care Association
22    or others. I just happened to keep it over the years.
23    There's some studies that were done by a PhD -- I can't
24    remember her name now in San Francisco.
25 Q. Charlene Harrington?

Page 81

1  A. Yep. I've got some of her stuff. But again, all of her
2     data comes from CMS. The source is all the same.
3     Sometimes I might get it from these other sources, but
4     it's all the same. And my purpose for doing it is just
5     to show a basic comparison. And that's what I mean by
6     this is a comparison. This is not an empirical
7     comparison in terms of where I can attest to the
8     absolute accuracy. Because there's quite a divergence
9     here, My whole point is they are way outside what an
10    average facility would be. So, that's the whole purpose
11    of me doing that.
12 Q. I think you may have alluded to this earlier, but let me
13    just run through this. When you reviewed the chart in
14    this case, the Sage View chart from Miss Witt, did you
15    see any evidence of good nursing care?
16 A. Oh, sure. I mean, you can't have someone there and not
17    do some good things. I mean, unfortunately, that
18    doesn't get me very far in discussion with a surveyor
19    that's not too happy with me. But, for example, we can
20    take this frequent person that comes up as Miss Jones
21    who appeared to have this either talent or willingness
22    to spend extra time to help feed her. She is a good
23    example of someone that I think hopefully -- or
24    unfortunately there weren't more of her. But, I mean,
25    she's a good example of what I thought was a good thing